## Carpenter et al. v. Wynn et al.

(Decided Jan. 26, 1934.)

TYE, SILER, GILLIS & SILER for appellants.
POPE & UPTON for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

On July 21, 1931, W. M. Carpenter, Sr., then a man 87 years old, executed his last will and testament, signing his name in the presence of D. W. Siler and Charlie Siler, who in his presence and in the presence of each other signed their names to the will as attesting witnesses. In company with D. W. Siler, Carpenter then went over to a store run by Irvine Brown whom he asked also to sign his will as an attesting witness, and this Brown did. At the time the appellant executed this will, he had six living children, the appellants, William Carpenter, Jr., Jarvis Carpenter, Angeline Foley, and Amanda Kerr, and the appellees, Alice Wynn and Elizabeth Partin. He had one other daughter who had married John Bennett, but who at this time was dead. By his will, Carpenter devised to his daughter Angeline Foley a life estate in some land he owned on Trace Branch. After her death, that property was to be divided among his other five children. He also bequeathed to Angeline Foley $50 in money and to Amanda Kerr a like sum, in addition to her remainder interest in the Trace Branch farm. The will as originally drawn devised to the two sons $500 each and a one-fifth re-

mainder interest each in the Trace Branch farm. To John Bennett, the husband of the deceased daughter, he bequeathed the sum of $1 and no more. To his daughter Alice Wynn, he devised the home farm, worth about $1,000; the Gatliff tract of land, lying on the ridge around the tunnel; live stock; growing crops; farm implements and household furniture; a one-fifth remainder interest in the Trace Branch farm and one-half of the remainder of his cash on hand after the specific bequests to his other sons and daughters had been paid. To his daughter Elizabeth Partin, he bequeathed the other half of this cash on hand and a one-fifth remainder interest in the Trace Branch farm. A few days after this will was drawn, the testator summoned the draftsman, D. W. Siler, who was also an attesting witness, and informed him that he desired to raise the specific bequests he had made to his two sons from $500 to $700, and in the presence of this attesting witness he struck out the word "five" in these two bequests and substituted the word "seven" in lieu thereof. Dr. Lee Rose being present, he was asked to sign the will as a witness to what the testator had then done. However, neither the testator nor D. W. Siler resigned the will. In the following April, the testator died. The will was probated in the Whitley county court on May 2, 1932. From the order of probate, an appeal was taken to the Whitley circuit court, the will being attacked because of the manner of its execution and because of a claimed lack of testamentary capacity on the part of the testator and of a claim of undue influence exerted upon him by Alice Wynn. After both parties had introduced their evidence, the court submitted the questions of lack of testamentary capacity and undue influence to the jury. These two issues were found in favor of the propounders of the will, whereupon the court ordered the will to probate with the bequests to the sons reading $700 instead of $500. From that judgment, this appeal is prosecuted.

It is first argued that the case should be reversed because the court should have peremptorily instructed the jury in favor of the contestants on the issues of undue influence and lack of testamentary capacity, or, if this be not so, that the verdict finding the testator had a testamentary capacity and was not unduly influenced is flagrantly against the evidence. A discussion of this ground requires a brief resume of the evidence.

For the contestants, there was proof to show that the testator for some time prior to the execution of his will had become very feeble in body; that he was unable to get about without the aid of two sticks; that, although as a young man he had been a school-teacher and a man of strong mentality, yet in the latter years of his life his mind seemed to not be as acute as it earlier had been; that he did things which indicated a lack of sufficient mentality to execute a will, as, for instance, when he went to vote, he would stamp his ballot after the name of every candidate on that ballot, thus spoiling it; when he went to the store to make purchases, he completed each purchase and paid for it, getting his change, if any, before making another purchase; when talked to he would not hold to the subject, but would change it; when baptized shortly after having written the will, he exhibited such emotion as that it was doubtful if his mind was sound; that the will itself was in direct variance with the oft-expressed purpose on the part of the testator to divide his property equally among his children; that when he met old friends in the road he would not greet them as jovially as he formerly did; that the daughter Alice Wynn boasted of her power to make her father do as she wished; that she stated she was going to make him draw the will leaving her the most; that after the will was drawn she said she had gotten her father to raise the bequests to her brothers from $500 to $700 to stave off a contest; that when she told her father to sit down, he would sit down, and that she had accompanied him to the home of the draftsman when the will was drawn. Some of this evidence for the contestants was weakened by cross-examination, as, for instance, when his son-in-law, Angeline Foley's husband, whom it appears the testator had supported for a number of years and who was not as industrious as he might have been, after having testified that the old man would not hold to a subject in a conversation, on cross-examination said:

"Q. Now, Jim, if I understand you, when you would go there and want to talk to Uncle Bill, your father-in-law, that he would first want to talk about things of his own. A. I would go there to talk to him and—

"Q. Is that so? A. Maybe I would want to borrow something and he wouldn't pay any attention."

Whether this displayed a lack of testamentary capacity or a certain shrewdness in the old man was of course for the jury to say, but in the light of the record it is not hard to understand why they regarded it in the latter light. Further, many of the witnesses who had said that the old man did not have testamentary capacity were forced on cross-examination to say that they never heard of him saying a foolish thing, making a foolish trade, or squandering his money. The minister who baptized Carpenter and who testified that the old man's mind was not of sufficient capacity to make a will, on cross-examination said:

"Q. Tell the jury that if during that meeting Uncle Bill joined the church. A. He didn't join the church but made it right with the Lord and was baptized.

"Q. Made a confession? A. Yes, sir."

Thus it would seem that the emotional conduct of the old gentleman at the time was due to a religious experience in which the minister himself recognized the ability of the old man to make his peace with his Creator. Further, the contestants produced proof to the effect that Alice Wynn had entreated several close friends of the testator to get him to make a will favoring her. It is hard to see why she would do this if she had such control and power over the old man as the contestants contend she had.

For the contestees, it was shown that Alice Wynn, the chief beneficiary of the will in question, had for many years prior to her father's death, during which time his other children, save Elizabeth Partin, visited him not at all or only at long intervals, lived with her father on his farm and took care of him. He drew a pension from the government, the major portion of which he banked, using a small part of it for coffee, tobacco, and a few provisions such as sugar and sometimes lard. Alice Wynn, a widow, worked like a man on the farm and raised the corn and hogs that made the meal and meat the family, including her father, ate. Elizabeth Partin, her sister, did the washing for their father. Because of certain physical ailments of the old man, this was a very disagreeable task to do. The old man would write the postmaster as to the disposition to be made of his pension check when he was unable to get from his home to the post office. He had never

made a foolish trade nor said a foolish thing, and took care of his money in a prudent and thrifty manner. He had a dominating personality not easily influenced. At the time his will was drawn, he rode his mule from his home down to the home of the draftsman, Alice Wynn walking beside him leading the mule. Alice Wynn waited out in the yard while he went into the house and had the draftsman draw the will. After the draftsman had drawn it at the old man's dictation and when it had been written, the testator borrowed the draftsman's "specs" and read the will over before signing it. A few months later the old man wrote down in most legible handwriting a record of family births and deaths. He stated on every occasion that he thought Alice Wynn should have the most of his estate and Elizabeth Partin the next most because the former had lived with him for years and done the hard work on the farm and had taken care of his bodily needs, and Elizabeth Partin had done the menial tasks of washing his clothing and keeping him physically clean. He said that for 33 years he had supported his daughter Angeline and her shiftless husband, and that he made due provision for a home for her for life; that his other daughter had married well and did not particularly need assistance as did his widowed daughter, Alice Wynn; that he had financed his son William, who seems to have had a liking for lawsuits and was known as "Lawing Willie," in the latter's lawsuits, and that he and his son Jarvis were not on friendly terms because of the disappearance of a large sum of money which he thought Jarvis' son had stolen. There was evidence to show that Alice Wynn did not dominate her father as the contestants claimed she did. There were also a number of lay witnesses who gave it that in their judgment the old man was not easily influenced, and that he had testamentary capacity. From this resume of the evidence, it is obvious that the questions of undue influence and testamentary capacity were rightly submitted to the jury, and that, if they chose to believe the contestees' proof, they were well warranted in so doing, and their verdict is amply supported by the evidence.

The next ground urged for reversal is this: At the outset of the case, the trial judge made this statement to the jury:

"Now, gentlemen, as I understand the law in this sort of cases, there is only one question for this

jury to determine. First, whether or not the testator, William Carpenter, Sr., had sufficient mind to know the natural objects of his bounty. Second, to make a distribution of that according to a fixed purpose of his own."

The record fails to disclose that any objection was made at the time to this statement of the court. Later on, however, in the introduction of the testimony, the court again made a statement of somewhat similar import, to which the contestants did object and except. However, we fail to find in the motion and grounds for a new trial any reliance on this claimed misconduct of the judge. Hence, it is obvious that it cannot be considered as grounds for reversal, but beyond that, we have seen that the contest in this case raged, not only over the question of testamentary capacity, but also over that of undue influence. Both were submitted to the jury by proper instructions, and hence it is obvious that, if the court was not quite accurate in its preliminary observations, the jury was not misled thereby, and the remarks of the court do not constitute prejudicial error.

It is lastly contended that the court should have rejected the paper offered for probate because of the manner in which the legacies of $500 to the two sons were raised to $700. It is argued that this alteration constituted a revocation of the original will, and, not having been made as the law requires a will to be executed, the will was not republished. Conceding arguendo that the raising of the bequests to the sons from $500 to $700 was invalid, we are yet met with the problem as to whether this alteration constituted a revocation of the entire will or is simply invalid as to the raise. As pointed out in the very-well considered case of Sanders' Adm'r v. Babbitt, 106 Ky. 646, 51 S. W. 163, 21 Ky. Law Rep. 240, the controlling facts to be ascertained in passing upon the question of revocation are, first, What did the testator do by way of cutting, tearing, burning, obliteration, cancellation, or destruction? and, second, With what intention did he do such act or acts? for, under section 4833 of the Statutes, the acts done must be accompanied by animo revocandi. Without such intention, the acts of themselves will not amount to a revocation. The intention being important, we then run into that class of cases where, to quote from Youse v. Foreman, 5 Bush, 337:

"The testator does an act of cancellation or mutilation with a view of having his will immediately changed or altered; where the act of cancellation and the reconstruction of the will are intended as a part of the same transaction, and the reconstruction or republication of the will is not perfected."

In such state of case, the acts of cancellation are disregarded as incomplete because of the failure of the other essential acts. This is the doctrine of dependent relative revocation. As pointed out by Mr. Warren in his monograph on this subject in 33 Harvard Law Review, 337, this expression is found as early as 1788 in the First Edition of Powell on Devises, where the author says:

"This principle, that the effect of obliteration, cancelling, etc., depends upon the mind with which it is done, having been pursued in all its consequences, has introduced another distinction not yet taken notice of; namely, that of dependent relative revocations, in which the act of cancelling, etc., being done with reference to another act meant to be an effectual disposition, will be a revocation or not, according as the relative act is efficacious or not."

See, also, Page on Wills, sec. 263, 275-277, and Schouler on Wills, Executors and Administrators (6th Edition) secs. 632 to 637. As Mr. Warren points out in his monograph and the authors to which we have referred in their text, the controlling factor so far as these cases in the United States are concerned is the actual intent of the testator in each case, and, if it appears that he did not intend that an alteration or cancellation of his will should have effect except that a new will or new provision be efficacious, then, in the event the new will or provision be not efficacious, the alteration or obliteration in the old will will not be given the effect of revoking the old will because of the lack of the animus revocandi. The cases on this subject are collated in the monograph and texts to which we have referred. In the instant case, it is clear that the testator intended his sons to have $500 each at all events, and that he did not mean that, if they could not receive $700, the old will was to be invalid. In that event, the two sons would receive very much more than the $700. But it is clear that the old man did not wish them to receive any more than that sum. He certainly wished them to receive the

$500 if they could not receive the $700, and, therefore, conceding that the alteration was invalid, it did not amount to a revocation of the old man's will because of the lack of intention that the will should be void in the event the raise was not effective. Those who will be affected by the raise from $500 to $700 if it be invalid are not complaining that the will was probated as one carrying $700 bequests, and the sons cannot complain that the will was so probated. Hence, it is not material to decide whether the raise was valid or not. It is simply sufficient to say that, even if invalid, it does not otherwise affect the will as originally written.

No error appearing prejudicial to the substantial rights of the appellants, the judgment of the lower court is affirmed.