## Wynn v. Wynn.

Nov. 20, 1942.

W. R. Henry for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

This appeal presents a controversy between mother and son, involving the cancellation of a deed from the mother to the son. The mother is a widow about 70 years of age; the son is about 26. The father of appellee died about the year 1932, leaving her a small tract of land, title to which is in controversy here. Carpenter v. Wynn, 252 Ky. 543, 67 S. W. (2d) 688.

During the last days of the father's life appellee took care of him, and the son, the youngest of several children, lived in the home with the mother and grandfather. In 1934 the young man married and lived with the mother on the homestead for a while, then moved to another place about 15 miles distant. While they were living together the son expressed a desire to buy the home place, but there was no agreement. After the son moved it seems the mother came to his home and remained there for some time. There was a renewal of the proposal to purchase or sell the home place, upon condition that the son would move back; after discussion there was

some sort of an agreement. The parties repaired to the office of an attorney where a deed was prepared.

It is in proof that the consideration for the transfer was $100. Later, the date is indefinite, the parties moved back to the home place and lived for several years, when certain alleged occurrences caused the mother to leave and go to the home of another son.

This deed was never put to record; the mother says appellant placed it in a fruit jar and buried it and the "worms ate it up." The son says it was placed in a jar and set up in the loft of the cabin home. There is inference that the deed was destroyed by the mother, or by another at her instance. Be that as it may, when it was discovered that the deed had been mutilated another deed was made which for some unexplained reason was never recorded, and was lost or destroyed. Later, on July 10, 1938, the mother had a third deed prepared and put to record, and this is the subject of the controversy.

After its execution the mother continued to live with the son until some time prior to July 1940, when the mother left and went to the home of another son. Upon the date mentioned she filed her suit in equity asking cancellation of the deed of 1938, on the grounds that it had been executed by her solely upon condition that the son should take care of the mother during her lifetime, furnishing her maintenance and support. That she had fully relied upon his promise, and but for which she would not have executed the deed; that notwithstanding his promise she was compelled during the years 1939-40 to do menial labor, and the son had not at any time contributed anything toward her support.

Issue was raised by an answer on the part of the son, who denied without affirmative plea. After proof was taken the chancellor adjudged cancellation of the deed, and restoration of the property to the appellee, and from this judgment appeal is prosecuted, the only question presented by the pleadings being one of fact; that is, was there a promise to keep and care for the grantor during her life, and if so was the agreement adhered to.

At the outset it may be noted that the parties to the suit are uneducated; neither could read nor write, and the mother could not count money. The property involved consisted of a tract of about 15 or 16 acres, a small

portion being bottom land, the major part being hilly land not suitable for cultivation. There is no real satisfactory proof as to the value of the land, the witnesses testifying fixing its value at from $250 to $2,000. The son contends a value of $250, because when purchased by the grandfather, as best we gather in 1888, the consideration was $250. In the opinion of this court in the will contest we indicated that the homestead devised to the appellee was worth about $1,000, and there is some proof fixing that value.

The son insisting that the deed was executed for a valuable consideration, says that when the first deed was executed he handed the attorney $100 in currency, and it was counted over to the mother by the attorney because the mother could not count. The attorney remembered that the consideration for the conveyance was $100, handed to him and he ''passed it on to the mother.''

The mother says this is true, but that the son, desirous of keeping the execution of the deed secret from other members of the family, asked his mother to give him $100 which she did, and that in the attorney's office the money came back to her. On this point we have only the direct testimony of mother and son, he insisting that it was his money, though he is rather hesitant about telling where he obtained it. There is some proof of more or less probative value, that he had been heard to say that he had done just what his mother said. However true this may be, it is apparent from the pleadings that the only deed in question is the 1938 deed; the mother claiming that it was executed to him under the promise that he would care for her for life.

In his answer he did not set up or attempt to rely upon the execution of the first or second deed, so any proof as to the first one may be considered only so far as it reflects on the issue concerning the third deed.

The mother insists, contrary to the claim of the son, that she did not voluntarily offer to sell him the land; that he kept after her to make the deed. Mrs. Wynn was positive that when she made the last deed she said to him, ''Lee I will fix your deed back if you will keep me my lifetime,'' and he agreed. This the boy denies, though not in a definite manner. The mother also says she told the draftsmen of the second deed ''to fix this to hold this land and protect me as long as I live,'' and she did not

discover that the deed did not contain the salutary provision until after things got so disagreeable for her at the son's home she had to leave and go elsewhere.

The deed in question, the one of 1938, recited the consideration as being "the sum of One Dollar and other good and valuable consideration." Appellant contends that the "good and valuable consideration" was the $100 paid by the son when the first deed was executed. The attorney who drew the latter deeds about two years apart in point of time says that Mrs. Wynn came to his office and told him of the loss of the second deed. He relates that she said she had given all her children a farm except one daughter; "she had offered to give her one but she didn't like it, and she wanted to exchange it for some mountain land; * * * that she was anxious to get each one of her children fixed up with a farm." He also said that the mother said "that her dady wanted Lee to have the property and she wanted him to have it." He also stated that he had prepared the deed according to her directions, and read and explained it to her as she couldn't read or write.

Counsel does not say, nor was he asked what her directions were; it is left to be inferred that perhaps Mrs. Wynn was making a gift to the son, or was making the conveyance for the former claimed cash consideration. Whatever construction may be put on the testimony by parties it may be construed to mean that it was the intention of the parties, or at least the mother, that the consideration was to be as stated.

Coming now to the question as to whether or not the son adhered to his alleged agreement, it appears that after the first deed was executed the mother lived with the son for the greater part of the time, until shortly before the suit was filed, when a quarrel arose between the mother and son upon some trivial matter. The daughter-in-law took a conspicuous part in this, using violent language and making some threats. However, the mother says she was compelled by her son during her stay to do manual and menial labor; working in the fields, cutting and carrying wood, cooking, washing and tending the wants of the three or four children. She had reached a point where she could no longer work. The son merely says that if she worked it was when he was not at home; that he had taken care of her to the best of his

ability. The mother says he never contributed to her support, but on the other hand she practically kept up the family, and that what little money she had left from the estate had been put to use by the son.

Testimony on these points, by others than the parties, is not of great probative value. The son introduces friends and relatives who were in the home on sporadic occasions, who say the mother never worked, and seemed to be well cared for. Witnesses for the mother, who were also around the home on occasions, saw the mother at work, and she is corroborated to some extent in her proof that she was neglected.

There are unexplained circumstances appearing in the testimony which lend difficulty to a fair understanding of the situation; for instance there is no doubt but that the first deed was placed in the jar, whether buried as the mother says, or placed in the rafters of the home. If it was a bona fide execution for a valid consideration, there should have been no reason for secrecy. It is noted that when the last deed was made the mother had it put to record.

As we view the entire testimony there is presented to us a typical case for the application of a well-defined and frequently applied rule in equity cases, particularly where the evidence presents a close question. Here the chancellor reached the conclusion upon sharply conflicting evidence that the consideration for the transfer was as contended by the mother and there was a failure of consideration. His finding, based on facts and circumstances which, when considered by this court, leaves the mind in doubt as to the truth of the matter and compels us to apply the rule, hence the chancellor's judgment will not be disturbed. Martin v. Jacoby's Adm'r, 223 Ky. 674, 4 S. W. (2d) 684, and cases therein cited.

Judgment affirmed.